[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17059
_____

D.C. Docket No. 1:13-cv-23671-MGC


THOMAS BINGHAM,

                                                    Plaintiff-Appellant,

versus

HCA, INC.

                                                    Defendant-Appellee


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 31, 2019)


Before MARCUS, BLACK, and WALKER,[*] Circuit Judges.

WALKER, Circuit Judge:

_____

[*] John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

This is a *qui tam* action brought under the False Claims Act by Plaintiff-Appellant Thomas Bingham ("Relator") against Defendant-Appellee HCA, Inc. ("HCA"). HCA is a healthcare services provider that owns and operates hospitals and surgery centers throughout the United States. Relator's claims relate to the Centerpoint Medical Center in Independence, Missouri (the "Centerpoint Claims") and the Aventura Hospital in Aventura, Florida (the "Aventura Claims"). On November 4, 2016, the district court (Cooke, J.) entered judgment in favor of HCA following its grant of summary judgment on the Centerpoint Claims and dismissal of the Aventura Claims on the pleadings. Relator appeals, arguing that the district court erred in granting both motions. For the reasons set forth below, we AFFIRM the judgment of the district court.

## I.    BACKGROUND

We begin with a brief overview of the False Claims Act, then describe the factual premise of Relator's claims, and conclude with the procedural history of the case.

### A. Relator's Claims Under the False Claims Act

"The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). The False Claims Act "permits private persons to file a form of civil action (known as *qui*

2

*tam*) against, and recover damages on behalf of the United States from, any person who . . . 'knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval . . . [or] knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.'" *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1307 (11th Cir. 2002) (quoting 31 U.S.C. § 3729(a)(1)–(2)). For his services, the relator is entitled to a substantial percentage of the recovery. 31 U.S.C. § 3730(d).

Relator's claims under the False Claims Act are for certain allegedly improper Medicare payments received by HCA. The claims are predicated on his assertion that HCA violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and 42 U.S.C. § 1395nn(a) (the "Stark Statute"), by providing sweetheart deals to certain physicians who leased space in medical office buildings developed by HCA in exchange for patient referrals from those physicians. Noncompliance with either statute is a bar to the receipt of Medicare payments, and therefore a violation of either statute can form the basis of liability under the False Claims Act for past Medicare payments attributable to the violations. *United States ex rel. Bingham v. HCA, Inc.*, No. 13-23671-CIV, 2016 WL 344887, at *2 (S.D. Fla. Jan. 28, 2016).

3

B.  The Centerpoint Claims

In 2003, HCA began to develop the Centerpoint Medical Center, a new hospital and medical office building ("MOB") in Independence, Missouri.  HCA hired Tegra Independence Medical Surgical, L.C. ("Tegra"), a third-party developer, to develop the MOB.  As part of the development project, Tegra leased out space in the MOB to physicians.  In 2012, Tegra sold the MOB for $50 million.  Relator alleges that as part of the development of the MOB, HCA paid Tegra $4 million in allegedly improper subsidies, primarily through an initial lease and an arrangement involving parking facilities at the MOB, which Tegra passed on to physician tenants through payments under Cash Flow Participation Agreements ("CFPAs") between Tegra and physician tenants, low initial lease rates, restricted use waivers, and free office improvements.  In exchange, Relator alleges, HCA received $260 million in Medicare and Medicaid payments from patients referred to HCA's hospital by the physician tenants.

Tegra offered CFPAs to any physician tenant who would sign a ten-year lease.  The CFPA entitled the physician tenant to a pro-rata share of the property's operating cash flow, including proceeds from any sale of the building.  A project manager for Tegra stated in an affidavit that a "ten-year lease term was longer than the average lease term in the market at the time the CFPAs were negotiated and executed."  App'x 117-6 ¶ 21.  The formula used to calculate a physician tenant's

4

payout under his or her CFPA depended on the amount of space that person leased. The leases entered into in 2006 and 2007 between Tegra and physician tenants who also signed on to CFPAs provided for a rental rate of $18.90 per square foot.

On January 1, 2005, an appraiser engaged by HCA, Holladay Properties ("Holladay"), performed a market rent study on the rental space in the MOB and concluded that the fair market rent range was $14.50 to $19.00 per square foot. This study assumed free parking and did not take into account the CFPAs. In June 2005, that appraisal was updated to reflect, among other things, Tegra's use of the CFPAs, and confirmed that the fair market rent range was still $14.50 to $19.00 per square foot. In 2007, Holladay certified that the business and lease terms were consistent with fair market value, signed the study, and provided it to HCA.

On June 18, 2007, Holladay prepared a Standard Business and Lease Terms Memorandum. The memorandum noted that the CFPAs were being offered to physician tenants and concluded that the fair market rent range was $21.50 to $23.50 per square foot. The memorandum stated that the increase in rental rates was due to higher construction costs.

Relator also alleges that HCA gave physician tenants restricted use waivers and free office improvements. In support, he points to one example in which a doctor wanted to install a digital rad machine, which, because it was non-standard, required modifications to his suite as well as the approval of HCA, as the operator

5

of the hospital.  Relator alleges that HCA, rather than physician tenants, made free improvements to office spaces, based on the fact that the general contractor who worked with HCA applied for the building permits, and HCA was shown as the "owner" on the building permits, many of which were filed prior to the start of the physician tenant's lease.

### C.  The Aventura Claims

The Aventura Hospital is a hospital complex in Aventura, Florida that is owned and operated by HCA.  In 2002, HCA recruited the Greenfield Group ("Greenfield") to develop a MOB adjacent to the Aventura Hospital.  The alleged Aventura arrangement was broadly similar to the alleged Centerpoint arrangement. Relator alleges that HCA financed and subsidized Greenfield through a ground lease and development agreement.  In 2007, Greenfield sold the MOB, and Relator alleges that profits were paid to physician tenants who partnered with Greenfield. Relator also alleges that HCA provided direct remuneration to referring physician tenants, including free parking rights and benefits, below market rents, subsidized common area maintenance, and free use permissions.  Procedural History

On August 15, 2014, Relator filed his First Amended Complaint ("FAC"), and on February 23, 2015, the United States declined to intervene in the suit, as permitted by the False Claims Act.  *See* 31 U.S.C. § 3730.  On July 22, 2015, the parties jointly moved to stay discovery pending resolution of HCA's anticipated

motion to dismiss.  The district court denied that motion, and discovery began.

HCA then moved to dismiss Relator's complaint.  On January 28, 2016, the district

court dismissed the Aventura Claims without prejudice for failure to comply with

Rule 9(b) of the Federal Rules of Civil Procedure but allowed the Centerpoint

Claims to continue.  On March 8, 2016, Relator filed his Second Amended

Complaint ("SAC"), which included additional facts pertaining to the Aventura

Claims.   Thereafter, HCA moved for summary judgment on the Centerpoint

Claims.  On April 6, 2016, the district court, following a hearing, granted that

motion.  Finally, on October 14, 2016, the district court granted HCA's motion to

strike impermissible facts in Realtor's SAC and dismissed the repleaded Aventura

Claims.  On November 4, 2016, the district court entered a final judgment that

dismissed the Aventura Claims on the pleadings and granted summary judgment to

HCA on the Centerpoint Claims.  This appeal followed.

## II.    DISCUSSION

On appeal, Relator argues that the district court erred in entering final

judgment in favor of HCA on both the Centerpoint and Aventura Claims.  We find

no error and affirm the district court's judgment.

A. Centerpoint Claims

i. Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same legal standards that bound that court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005) (internal quotation marks omitted). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact' such that 'the movant is entitled to judgment as a matter of law.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1153 (11th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (internal quotation marks omitted). The appeals court "will affirm a grant of summary judgment if it is correct for any reason." *United States v. $121,100.00 in U.S. Currency*, 999 F.2d 1503, 1507 (11th Cir. 1993).

ii. Anti-Kickback Statute Claims

Relator's first claim under the False Claims Act is predicated on his allegation that HCA violated the AKS. *See* 42 U.S.C. § 1320a-7b(b). The AKS

8

"broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1272 (11th Cir. 2018). In relevant part, it provides that "[w]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony." 42 U.S.C. § 1320a-7b(b)(2)(A).

An AKS violation thus requires that there be "remuneration" offered or paid in the transaction at issue. Because "remuneration" is not specifically defined in the statute, we must turn to "the common usage of words for their meaning." *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018) (internal quotation marks omitted). "To determine the ordinary meaning of a term, we often look to dictionary definitions for guidance." *Id.* Black's Law Dictionary defines "remuneration" in pertinent part as "[p]ayment; compensation." *Remuneration*, Black's Law Dictionary (11th ed. 2019). Compensation, in turn, cannot be given unless some sort of benefit is conferred. *See, e.g., Compensation*, Black's Law Dictionary (11th ed. 2019) ("Remuneration and other benefits received in return for services rendered"). In a business transaction like those at issue in this case,

9

the value of a benefit can only be quantified by reference to its fair market value. *See also Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006) ("Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value.").

This understanding of "remuneration" is supported by the definition of "remuneration" in 42 U.S.C. § 1320a-7a(i)(6), which relates to civil monetary penalties in connection with medical fraud.  Although that definition is limited to that particular section of Title 42, it also defines "remuneration" to include the "transfer[ ] of items or services for free or for other than fair market value" and thus is consistent with our view of the correct definition.  *Id.*

For these reasons, the issue of fair market value is not limited to HCA's safe harbor defense, as Relator suggests, but is rather something Relator must address in order to show that HCA offered or paid remuneration to physician tenants. Here, Relator argues that HCA passed remuneration to physician tenants through Tegra, so the critical question we must ask is whether physician tenants received anything of value from Tegra under or in connection with their leases in excess of the fair market value of their lease payments.

Relator first points to the "low-end" rents that physician tenants paid for space in the MOB.  But Relator concedes that the proposed rents were within the

range of "market rates" for new construction. Appellant's Br. at 20. And although the fair market rent range increased between the 2005 and 2007 appraisals, the appraiser determined that the increase was due to higher construction costs. Moreover, judging from the leases that Relator attached to his FAC, it appears that many leases were entered into during 2005 and 2006, prior to the 2007 appraisal, which would make them less "low-end."

Relator also points to profits received by physician tenants through the CFPAs as evidence of unlawful remuneration. But Relator has not shown that these agreements conferred any benefit in excess of fair market value. CFPAs were offered only to tenants who would sign a ten-year lease, which was a longer term than the market average at the time those lease agreements were negotiated. In addition, Holladay's two market rent studies conducted during 2005 confirmed the same fair market rent range before and after taking into account the CFPAs, thereby demonstrating that these agreements did not confer any additional value to physician tenants.

Relator also argues that HCA made free improvements to the offices of certain physician tenants and gave certain physician tenants restricted use waivers. But neither of these allegations is supported by sufficient facts. Relator does not tie the improvements to specific physician tenants who were or could be referral sources, nor does he present evidence that the use waivers were anything other

11

than a standard exercise of discretion under the relevant leases or that HCA was required to ask for something in exchange for the use waivers. "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis*, 432 F.3d at 1326.

For these reasons, we conclude that Relator has not shown that HCA conveyed any remuneration to physician tenants of the Centerpoint MOB, and therefore that Relator's AKS claim fails on summary judgment.

### iii.  Stark Statute Claim

Relator's second claim under the False Claims Act pertaining to Centerpoint is that HCA violated the Stark Statute. *See* 42 U.S.C. § 1395nn(a). "In its most general terms, the Stark statute prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 698 (11th Cir. 2014) (citing 42 U.S.C. § 1395nn(a)(1)(A)). The Stark Statute also "prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients." *Id.* (citing 42 U.S.C. § 1395nn(a)(1)(B)). A prohibited "financial relationship" includes a "compensation arrangement," 42 U.S.C. § 1395nn(a)(2)(B), defined as "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity [providing a designated health

12

service]," subject to certain exceptions,    42 U.S.C. § 1395nn(h)(1)(A). "Remuneration," in turn, "includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1395nn(h)(1)(B).  Both direct and indirect compensation arrangements are therefore prohibited under the Stark Statute.

In this case, there is no genuine factual dispute over whether a prohibited indirect compensation arrangement under the Stark Statute exists because it plainly does not.  Regulations promulgated in part under 42 U.S.C. § 1395nn define an "indirect compensation agreement" as requiring, among other things, that compensation received by a referring physician "varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician."  42 C.F.R. § 411.354(c)(2)(ii).  HCA has shown that there is no correlation between the size of physician tenants' space leases and their referrals to HCA, Appellee's Br. at 9, and Relator offers only conclusory statements that HCA "took into account the value of referrals" in planning the MOB,  Appellant's Br. at 32–33.  Even if Relator's contention is true, it does not show that the rental rates or other benefits allegedly given by HCA to any specific physician tenant are at all correlated with the volume or value of referrals from that physician tenant. Therefore, because there is no real basis in the record from which to conclude that compensation paid by HCA to physician tenants varies with or takes into account

13

the volume or value of referrals, there is no genuine factual dispute on this point. *See Ellis*, 432 F.3d at 1326.

Relator argues that the district court erred in considering this definition of an "indirect compensation arrangement" because it relates to exceptions under the Stark Statute rather than Relator's *prima facie* burden. But Relator waived this argument by failing to raise it before the district court. *See, e.g.*, *Denis v. Liberty Mut. Ins. Co.*, 791 F.2d 846, 848–49 (11th Cir. 1986) ("Failure to raise an issue, objection or theory of relief in the first instance to the trial court generally is fatal."). In fact, Relator cited approvingly to 42 C.F.R. § 411.354(c)(2) in his Opposition to Motion for Partial Summary Judgment. App'x 159 at 9.

For these reasons, we conclude that Relator has not shown that there is a financial relationship between HCA and physician tenants that violates the Stark Statute. We therefore agree with the district court that HCA was entitled to summary judgment regarding Relator's Centerpoint Claims.

### B. Aventura Claims

The district court dismissed Relator's Aventura Claims because it concluded that Relator "impermissibly use[d] information learned through discovery to supplement [these] allegations," and that without this additional information, the SAC did not meet the heightened pleading standard of Rule 9(b). *Bingham v.*

14

*HCA, Inc.*, No. 13-23671-CIV, 2016 WL 6027115, at \*4 (S.D. Fla. Oct. 14, 2016).

On appeal, Relator argues that both conclusions were erroneous.  We disagree.

i.  Grant of HCA's motion to strike information

On July 22, 2015, the parties jointly moved to stay discovery pending resolution of HCA's anticipated motion to dismiss.  The district court denied that motion, and discovery began.  HCA then moved to dismiss Relator's complaint. On January 28, 2016, the district court granted HCA's motion to dismiss Relator's Aventura Claims but allowed Relator to amend his complaint regarding these claims.  Discovery, however, had proceeded while the district court considered and decided HCA's motion to dismiss.  On March 8, 2016, Relator filed his SAC, adding additional facts pertaining to the Aventura Claims, including information obtained through discovery.  Thereafter, HCA filed a second motion to dismiss Relator's Aventura Claims and a motion to strike certain alleged facts on the basis that Relator's SAC impermissibly used information learned through discovery, and that, without that information, the SAC did not meet the heightened pleading standard of Rule 9(b).  The district court agreed and granted both motions. *Bingham*, 2016 WL 6027115, at \*4.

We review the district court's grant of HCA's motion to strike alleged facts from Relator's SAC under Federal Rule of Civil Procedure 12(f) for an abuse of discretion.  *See Branch Banking & Tr. Co. v. Lichty Bros. Constr., Inc.*, 488 F.

App'x 430, 434 (11th Cir. 2012); *McCorstin v. U.S. Dep't of Labor*, 630 F.2d 242, 244 (5th Cir. 1980). "[T]he abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) (internal quotation marks omitted).

Although courts should freely grant leave to amend pleadings, *see* Fed. R. Civ. P. 15(a)(2), amendments that include material obtained during discovery, prior to a final decision on the motion to dismiss, may not be appropriate in cases to which the heighted pleading standard of Rule 9(b) applies if the amendment would allow the plaintiff to circumvent the purpose of Rule 9(b), *see United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 804–05 (11th Cir. 2014). Applying Rule 9(b) to False Claims Act claims "ensures that the relator's strong financial incentive to bring [a False Claims Act] claim—the possibility of recovering between fifteen and thirty percent of a treble damages award—does not precipitate the filing of frivolous suits." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006). Indeed, "[t]he particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." *Id.* at 1359 (internal quotation marks omitted).

We agree with the district court that, in this case, the goals of applying Rule 9(b) to False Claims Act cases are advanced by striking information in Relator's

16

SAC that was learned through discovery, prior to a final decision on the motion to dismiss, because, as discussed further below, Relator's FAC did not satisfy the heightened pleading standard of Rule 9(b).  As the district court noted, it is important to discourage plaintiffs from being able to "learn the complaint's bare essentials through discovery" which could "needlessly harm a defendants' [sic] goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Bingham*, 2016 WL 6027115, at \*4 (quoting *Clausen*, 290 F.3d at 1313 n.24). Similarly, prohibiting a relator "to use discovery to meet the requirements of Rule 9(b) reflects, in part, a concern that a *qui tam* plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown wrongs." *Id.* at \*5 n.4 (internal quotation marks omitted).  Finally, allowing a relator to amend a complaint after discovery would force the government to decide whether or not to intervene in the case without complete information. *Id.* at \*5.

For these reasons, we conclude that the district court did not abuse its discretion in granting HCA's motion to strike information in Relator's SAC that was obtained through discovery.

### ii.  Grant of Motion to dismiss

"We review de novo the district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, accepting the factual allegations

17

in the complaint as true and construing them in the light most favorable to the plaintiff." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam). "A plaintiff must plausibly allege all the elements of the claim for relief. Conclusory allegations and legal conclusions are not sufficient; the plaintiffs 'must state a claim to relief that is plausible on its face.'" *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339–40 (11th Cir. 2017) (citation omitted) (quoting and citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007)).

Furthermore, "[a] complaint under the False Claims Act must meet the heightened pleading standard of Rule 9(b), which states '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (second alteration in original) (quoting Fed. R. Civ. P. 9(b)). "A False Claims Act complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* (internal quotation marks omitted).

Considering Relator's complaint after excising the additional information obtained through discovery, we agree with the district court that the remaining allegations do not satisfy the pleading requirements of Rule 9(b). On appeal, Relator argues that it was incorrect for the district court to assume that all of the

18

additional facts in his SAC were learned through discovery. Appellant's Br. at 38. But Relator does not point to specific facts in the SAC that he learned prior to discovery. Instead, he points us back to his FAC, arguing that his FAC pleaded all of the "essential elements" of the Aventura Claims. Appellant's Br. at 38. These elements are stated in the FAC on "information and belief," however, and Relator does not state with any particularity how HCA conveyed remuneration directly or indirectly to specific tenants of the Aventura MOB. App'x 14 ¶ 131, 134–35. Similarly, Relator's allegations that leases entered into between HCA and Greenfield did not reflect fair market value are supported, if at all, only by Relator's own calculations regarding the value of the land. App'x 14 ¶ 133, 136.

On appeal, Relator also points to specific allegations in his SAC that find a parallel in the FAC. Appellant's Br. at 39. But these allegations are similarly devoid of facts regarding the substance of HCA's alleged misconduct and do not describe in any detail the alleged misconduct, when it occurred, and who engaged in it. *See Hopper*, 588 F.3d at 1324. For example, Relator states in a conclusory fashion that, based on information and belief, the total amount of the ground lease payment from HCA to Greenfield was less than fair market value. App'x 14 ¶ 135. Similarly, although Relator alleged that HCA's Aventura scheme included "[v]aluable inducements offered and paid to referring physicians to encourage them to locate and maintain their offices on HCA hospital campuses" and

19

"[c]ontrol over third-party medical office building owners' relationships with their physician tenants . . . so as to ensure the flow of remuneration to physicians who referred patients to HCA," Relator does not provide specific details or evidence to support his claims that long-term ground leases were "[g]rossly undervalued" or included "[o]verly generous" terms. *Id.* ¶ 5–6.

Therefore, we agree with the district court that Relator's allegations lack the "indicia of reliability" to support his Aventura Claims, *Bingham*, 2016 WL 6027115, at *5 (internal quotation marks omitted), and that Relator has therefore failed to state a claim under the False Claims Act with respect to his Aventura Claims.

## C. Conclusion

For these reasons, we AFFIRM the district court's grant of judgment in favor of HCA regarding Relator's Centerpoint Claims and Aventura Claims.

**AFFIRMED.**