[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10366

_____

TROY OLHAUSEN,

Plaintiff-Appellant,

*versus*

ARRIVA MEDICAL, LLC,
ALERE, INC.,
ABBOTT LABORATORIES, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20190-RNS

_____

Before WILSON, ROSENBAUM, Circuit Judges, and COVINGTON,[*] District Judge.

PER CURIAM:

We previously considered Troy Olhausen's appeal of the dismissal of his action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (2012) ("Act").  Olhausen brought suit against his former employers, Arriva Medical, LLC ("Arriva") and Alere, Inc. ("Alere"), and Abbott Laboratories, Inc. ("Abbott") (collectively, "Defendants"), alleging that they had submitted fraudulent claims to the Center for Medicare and Medicaid Services ("CMS") for reimbursement.

In considering the appeal for the first time, we affirmed.  We assumed without deciding that the complaint met the requirements of Federal Rule of Civil Procedure 9(b), and we concluded that Olhausen failed to adequately allege scienter, a requirement for a claim under the Act.  *Olhausen v. Arriva Med., LLC*, No. 21-10366, 2022 WL 1203023, at *1 (11th Cir. Apr. 22, 2022).[1]

Since our decision, the Supreme Court has expounded on the Act's scienter requirement.  *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–50 (2023).  After issuing its opinion

---

[*] Honorable Virginia Covington, United States District Judge, for the Middle District of Florida, sitting by designation.

[1] Our 2022 opinion references Olhausen's "second amended complaint."  *See* 2022 WL 1203023, at *1.  But there, and here, we analyze Olhausen's third amended complaint, the operative complaint.

in *Schutte*, the Supreme Court granted Olhausen's petition for a writ of certiorari, vacated our prior judgment, and remanded this case for further consideration in light of *Schutte*. *Olhausen v. Arriva Med., LLC*, 143 S. Ct. 2686 (2023) (mem.).

With the case before us again, we now review it on the grounds the district court dismissed it on: whether Olhausen alleged with sufficient particularity under Federal Rule of Civil Procedure 9(b) that Defendants submitted any false claims to the government. Because we conclude that he did—at least with respect to two of the three claims on appeal—we vacate and remand in part and we affirm in part.

On remand, the district court should consider in the first instance whether Olhausen's complaint sufficiently alleges the other challenged elements of Count II: falsity, scienter,[2] and materiality. Our opinion takes no position on any aspect of those questions.

## I.    BACKGROUND

We start with Olhausen's allegations. Because we are reviewing an order on a motion to dismiss, we accept the allegations in Olhausen's complaint as true and make all reasonable inferences in his favor.[3] *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). As relevant here, Olhausen alleges the following.

---

[2] The district court may wish to direct the parties to brief the scienter question, in light of *Schutte*.

[3] For this reason, the allegations may or may not turn out to be the actual facts.

4                    Opinion of the Court                    21-10366

A.  *Defendants undergo corporate restructuring and re-*
*ceive competitive bidding contracts.*

Arriva was a Florida-based provider of mail-order diabetic-testing supplies and other medical products.  It operated call centers in Arizona, Tennessee, and the Philippines.  Olhausen served as Arriva's Senior Vice President of Business Development and Marketing.

Alere acquired several companies in the 2010s, beginning with Arriva.  Alere bought Arriva in 2011.  During this period, Olhausen continued working for Arriva.  A couple years later, in 2013, CMS awarded Arriva a Durable Medical Equipment, Prosthetics/Orthotics and Supplies ("DMEPOS") competitive bidding contract to provide Medicare beneficiaries with mail-order diabetic supplies.

Returning to 2011, Alere also bought National Diabetic Pharmacy that year.  National Diabetic operated a call center and billing operations in the Philippines.  Alere moved all National Diabetic's beneficiaries into Arriva and formed a separate company it called Arriva Medical Philippines, Inc. ("Arriva Philippines"), which it incorporated as an indirect subsidiary of Alere.

Then, Alere used Arriva Philippines to service both Alere's and Arriva's beneficiaries in the United States.  Eventually, Arriva Philippines employed more than 800 people and comprised roughly 80% of Arriva's workforce providing services to United States beneficiaries.  As a result, Arriva Philippines's employees handled most initial intake calls, reorders, doctor-prescriptions

orders, and medical-records requests and billing for Arriva's United States beneficiaries.

Yet while Arriva Philippines provided these services and billed claims to CMS, it did so in a way that created the appearance that Arriva's Florida office was the one processing the claims. For this service, Arriva Philippines billed Arriva at cost plus five percent. Neither Arriva nor Alere ever disclosed Arriva Philippines to CMS. Arriva also operated call centers in Phoenix (Arizona) and Tennessee and shipped items from Hebron, Kentucky, even though Arriva never told Medicare about these locations and never obtained accreditation or a Medicare supplier number for them, either.

Meanwhile, in 2013, Arriva acquired Discount Diabetic, LLC, which Olhausen had owned. Olhausen entered into a two-year employment agreement with Arriva and stayed on as Arriva's senior vice president of business development and marketing. In this position, Olhausen reported directly to Arriva's president, William "Chip" Stocksdale.

Moving forward to 2016, CMS awarded Arriva another DMEPOS contract that year. The same year, Arriva received a notice of results of prepayment claims review from NHIC Corp, a durable-medical-equipment Medicare administrative contractor. NHIC determined that only 1% of Arriva's claims were acceptable as billed, 99% of the claims should have been denied based on medical necessity, and the overall charge denial rate was 96.5%. Similarly, later that year, CMS performed an educational audit of

Arriva.  That process denied 95% of Arriva's claims for lack of medical necessity.  Ultimately, in 2016, Arriva's Medicare billing number was revoked because it had billed for dead beneficiaries.

A few months later, in 2017, Alere bought American Medical Supplies, which had a valid Medicare billing number.  Alere itself also had a valid Medicare billing number and a competitive bidding contract.  Two months after that, Olhausen became the General Manager of American Medical Supplies, Inc., and he began reporting to Alere leadership.  At the same time, though, Olhausen also continued to work for Arriva, participate in Arriva's weekly meetings, and supervise some Arriva employees.

Later that same year, Abbott completed its purchase of Alere.  So by October 2017, Abbott owned Alere and—through its purchase of Alere—Arriva and American Medical Supplies, too.  But Abbott eventually shut down Arriva to limit its liability.  Between the time Arriva lost its billing number and Abbott shut Arriva down, Arriva furnished about $70 million in products to its beneficiaries.  And from 2012 until its shutdown, Arriva billed Medicare roughly $800 million total for its supplies.

### B.  Olhausen filed suit, alleging that Defendants committed healthcare fraud.

Olhausen filed this qui tam action on January 14, 2019.  He alleges that Arriva used different methods to file false and fraudulent claims for Medicare reimbursement with CMS and that it conspired with its parent companies, Abbott and Alere, to file such

claims.  This appeal is about Counts II, IV, and VI of Olhausen's complaint, which press three main theories of liability.

Olhausen brought his claims in Counts II and IV under both Section 3729(a)(1)(A) and Section 3729(a)(1)(B) of the False Claims Act.  Subsection (a)(1)(A) provides liability, in general, for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."    31 U.S.C. § 3729(a)(1)(A) (2009).  Subsection (a)(1)(B) declares liable "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).  And Olhausen's Count VI asserts a conspiracy among Arriva, Abbott, and Alere to have Arriva submit false Medicare claims under, as relevant here, the theories that Counts II and IV allege.

Count II contends that Defendants submitted false claims without obtaining required assignment-of-benefits signatures ("assignment-of-benefits claim").  Olhausen alleges that Arriva provided certain mail-order diabetic testing supplies without obtaining the "required" assignment-of-benefits signatures from beneficiaries[4].  He contends that obtaining assignments was important because, for some covered services, Medicare will pay a supplier directly only if a beneficiary "assigns the claim to the supplier and the

---

[4] The parties dispute whether signed assignments of benefits were legally required for these supplies.  We don't take any position on this issue, which—as we explain in this opinion—we remand for the district court's consideration in the first instance.

supplier accepts assignment." *See* 42 C.F.R. § 424.55(a). But without assignments, Medicare pays the beneficiary instead. *Id.* § 424.53(e). And the Medicare rules generally require a beneficiary's signature, regardless of whether the beneficiary submits the claim herself or assigns it to the supplier. *Id.* §§ 424.32(a)(3), 424.36(a).[5] The requirement that suppliers obtain assignments of benefits from beneficiaries before providing them with equipment is meant, in part, to reduce Medicare fraud.

Olhausen alleges that Arriva knew it needed to obtain assignments of benefits from its beneficiaries, but Arriva instructed its employees not to ask customers about assignments of benefits. In the summer of 2013, Olhausen suggested in an Arriva management meeting that Arriva obtain assignments electronically. But Arriva abandoned asking customers for electronic assignments of benefits because Arriva's U.S. Manager of Sales thought it would make sales calls longer and result in less commission money.

When Arriva submitted crossover claims to Medicare and Medigap, it allegedly represented that it had a "signature on file," even though those signed assignments did not exist. Olhausen alleges that Arriva knew about the lack of signed assignments because it regularly hired an outside consulting firm to internally audit its claims to CMS. And these audits regularly revealed that deficiency:

---

[5] The signature requirement has several exceptions. *See* 42 C.F.R. § 424.36(b)–(e).

- A consultant found that for new orders in the first quarter of 2013, Arriva obtained assignments of benefits for only 60% of the claims it submitted.

- A consultant found that for the second quarter of 2013, Arriva obtained assignments of benefits for only 65% of the claims submitted for new orders and 78% of the claims it submitted for reorders.

- Consultants found that for the third quarter of 2015, on average, Arriva had an assignment of benefits on file for the beneficiary for only 53% of heating pads Arriva shipped to its beneficiaries and billed to Medicare.

Even though Arriva received "similar audits and results monthly," Olhausen asserts, it never improved its assignment-of-benefits compliance for claims it billed to Medicare for heating pads, vacuum erection devices, and orthotic braces shipped to its beneficiaries.

Moving on to Count IV, that claim alleges that Defendants failed to disclose or accredit (or both) certain call-center locations that processed some claims for payment ("center-location claim"). These locations were in the Philippines, Arizona, and Tennessee.

By law, suppliers for certain items and services must comply with quality standards, as accreditation organizations specify them. 42 U.S.C. § 1395m(a)(20)(A). If they don't, they can't "furnish" items or services that the government pays for. *Id.* Nor can they receive supplier numbers, which they must use to submit claims

for reimbursement for those items or services. *Id.* And 42 C.F.R. § 414.422(f) requires suppliers to disclose each of their subcontracting arrangements related to the "furnishing" of items and services. So Olhausen contends that, in failing to disclose or accredit these other locations, Arriva unlawfully used the locations when it furnished items under the DMEPOS contracts.

As Olhausen alleges, Arriva had only an informal "business association agreement" with Arriva Philippines. Yet Arriva still "subcontracted nearly all of its duties to Arriva Philippines." And even if it were not a subcontractor, Olhausen alleges, Arriva Philippines, along with the call centers in Arizona and Tennessee, were additional locations for Arriva that unlawfully operated as undisclosed suppliers.

Arriva submitted claims from some of these undisclosed suppliers but made it appear as though Arriva's Florida office processed them instead. Olhausen and Arriva's management discussed obtaining supplier numbers and accreditation for the U.S.-based call centers, but Arriva decided against it. Yet when Arriva bid for its DMEPOS contracts with CMS, Arriva represented that its only location was in Florida and that it did not intend to use any subcontractors. Arriva never disclosed the other locations as suppliers or subcontractors. In Olhausen's view, using these undisclosed or unaccredited (or both) locations or subcontractors made all the claims that Defendants submitted under the DMEPOS contracts false.

Finally, Count VI asserts that Arriva conspired with its parent companies, Alere and Abbott, to submit false Medicare claims based on the regulatory violations alleged in Counts II and IV.[6]

After Olhausen filed this case, the government declined to intervene, and Defendants moved to dismiss Olhausen's third amended complaint.

### C. The district court granted Defendants' motion to dismiss on Rule 9(b) grounds.

The district court granted Defendants' motion. It held that Olhausen failed to plead, with the level of particularity required under Federal Rule of Civil Procedure 9(b), his allegations in both Counts II and IV.[7] As to both counts, the district court held that

---

[6] Although Count VI also pled conspiracy to commit the violations alleged in Counts I, III, and V, those counts are not at issue here. The district court dismissed those counts with prejudice under the first-to-file and government-action rules. Under the first-to-file rule, "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct [are] barred" under the Act. *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (citing 31 U.S.C. § 3730(b)(5)). Relatedly, under the government-action rule, a prospective relator may not bring an action under the Act "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Because Olhausen did not appeal the dismissal of those counts, we do not discuss them any further. ]

[7] Again, the district court dismissed the remaining counts under the first-to-file and government-action rules.

Olhausen failed to adequately allege with particularity that any fraudulent claims were actually submitted to the government.

In reaching this conclusion, the district court appeared to reason that both Sections 3729(a)(1)(A) and 3729(a)(1)(B) of the False Claims Act require alleging, with particularity, the actual submission of a claim.[8]  And because Olhausen did not work in the billing department (though he worked in management), the district court concluded that the allegations did not provide the necessary indicia of reliability establishing that false claims had been submitted.  The district court also found Olhausen could not sustain his claims based on firsthand knowledge because the complaint didn't allege he was directly involved with claim submissions.  The district court's opinion did not address Olhausen's allegations about internal audits of submitted claims.

### D. Olhausen appealed.

Olhausen raises three issues on appeal.  First, he argues that the allegations about the internal audits provide the indicia of reliability necessary under Rule 9(b).  Second, he asserts he doesn't have to plead with particularity that a false claim was in fact

---

[8] The district court's opinion does not cite any subsection of Section 3729 in conducting its analysis.  But we read its finding that "[n]one of Olhausen's claims adequately allege that a fraudulent claim was in fact submitted to the Government" as addressing both Olhausen's Section 3729(a)(1)(A) claims and his Section 3729(a)(1)(B) claims.  After all, the complaint specifies Olhausen's second and fourth causes of action as each arising under both subsections of the statute.

submitted on any of his Section 3729(a)(1)(B) claims. And third, because he contends the district court should not have dismissed Counts II or IV, Olhausen urges that the conspiracy claims in Count VI also should have survived.

We originally affirmed the district court's decision without addressing the district court's grounds for dismissing the case. Instead, we concluded that Olhausen had insufficiently alleged scienter to support his claims. 2022 WL 1203023, at *2. Olhausen sought certiorari. Then, in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–50 (2023), the Supreme Court expounded on the scienter requirement. After issuing its opinion in *Schutte*, the Supreme Court granted Olhausen's petition for a writ of certiorari, vacated our prior judgment, and remanded this case for further consideration in light of *Schutte*. *Olhausen v. Arriva Med., LLC*, 143 S. Ct. 2686 (2023) (mem.).

On remand, we address the grounds that the district court ruled on. To be sure, both parties briefed arguments on whether Olhausen adequately pled falsity, scienter, and materiality, even though the district court did not reach those issues. Yet both parties agree that we shouldn't reach those issues. And given that the Supreme Court has clarified the scienter issue since the parties briefed it, we agree. We think it makes better sense to return the issue to the district court to consider in the first instance. The district court may wish to direct new briefing that accounts for the Supreme Court's decision in *Schutte*.

Now, we address only two questions: first, whether subsection (a)(1)(B), like subsection (a)(1)(A), includes a presentment requirement—meaning a person must have presented false or fraudulent claims to the government for payment; and second, if so, whether Olhausen adequately alleged that Arriva presented to CMS the false or fraudulent claims that Counts II and IV charge.

## II.    STANDARD OF REVIEW

We review dismissals for failure to state a claim under the False Claims Act de novo. *Urquilla-Diaz*, 780 F.3d at 1050. In reviewing an order on a motion to dismiss, we accept the allegations in the complaint as true and make all reasonable inferences for the plaintiff. *Id.*

## III.    DISCUSSION

We divide our discussion into three parts. First, we consider whether Olhausen had to plead with particularity that an allegedly false claim was submitted when he pled Counts II and IV, the claims brought under Section 3729(a)(1)(B). Next, we address whether Olhausen met the applicable pleading standard for his claims in Counts II and IV. Last, we tackle the related Count VI conspiracy claim.

### A.  *The Section 3729(a)(1)(B) Pleading Standard*

We conclude that Section 3729(a)(1)(B), like Section 3729(a)(1)(A), requires plaintiffs to plead with particularity that an actual claim has been submitted. But unlike subsection (a)(1)(A),

subsection (a)(1)(B) does not require plaintiffs to plead that the defendant itself submitted an allegedly false claim.

We start from the premise that allegations under the False Claims Act must survive the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023). That means "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

We have stressed that Rule 9(b) "requires the false claim and, at least for § 3729(a)(1)(A), its presentment to be alleged with particularity." *See 84Partners*, 79 F.4th at 1360 (citing *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1308–09, 1313 (11th Cir. 2002)). So a relator's complaint must allege facts about the "'time, place, and substance of the defendant's alleged fraud,' [and] 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (quoting *Clausen*, 290 F.3d at 1310).

In analyzing an earlier version of Section 3729, we observed in *Clausen* that the False Claims Act does not punish misconduct generally. Rather, it creates liability when "the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311. We reasoned in *Clausen* that the then-prevailing version of Section 3729 required presentment because "there is simply no actionable damage to the public fisc as required under the False Claims Act" unless a claim was actually submitted, or

16                      Opinion of the Court                      21-10366

presented, to the government.[9]  *Id.*  Indeed, we emphasized that the act of submitting a fraudulent claim to the government was "the *sine qua non* of a False Claims Act violation."[10]  *Id.*

And just last year, we said that "the actual presentment or payment of a false claim" is "an essential element that must be alleged" in complaints litigants bring under the False Claims Act. *84Partners*, 79 F.4th at 1360.  We reasoned that this is true under both Sections 3729(a)(1)(A) and 3729(a)(1)(B).  *Id.*  That same requirement also applied, we said, under Section (a)(1)(B)'s predecessor on false-statements liability, the old Section 3729(a)(2).  *Id.* (citing *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017)).  We reiterated that alleging a fraudulent

---

[9] To be clear, *Clausen* says that Rule 9(b) applies to *all* actions brought under the Act.  *See* 290 F.3d at 1308–09.  And even though the Court in *Clausen* issued its ruling before the 2009 amendments to Section 3729, *Clausen*'s reasoning still prevails.  There, we reasoned that Rule 9(b) applied "because the Act subjects entities that knowingly submit 'false or fraudulent' claims to the Government for payment or approval—or knowingly make, use, or cause to be made or used a false record or statement to get such claims paid or approved—to civil liability."  *Id.* at 1309 (quoting the pre-amendment text of 31 U.S.C. § 3729(a) (2008)).  And "the Supreme Court and this Court have consistently recognized the Act as an anti-fraud statute."  *Id.*  This reasoning applies with equal force to the post-2009 amended version of Section 3729.  We see no basis to depart from it today.

[10] We have echoed this understanding in more recent cases after the 2009 amendments.  *See, e.g.*, *Partner84*, 79 F.4th at 1360; *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1316–17 (11th Cir. 2024) ("Of course, the '*sine qua non* of a False Claims Act violation' is the 'submission of a claim.'" (quoting *Clausen*, 290 F.3d at 131)).

scheme cannot by itself establish liability under the Act. *Id.* Instead, a relator must allege an *actual false claim*. *Id.*

In other words, the particularity standard in qui tam actions requires the relator to allege the "actual 'submission of a [false] claim.'" *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (quoting *Clausen*, 290 F.3d at 1311). We have said this over and over. It is not enough to plead generally that false claims were submitted, nor may a relator merely "point to 'improper practices of the defendant[]' to support 'the inference that fraudulent claims were submitted' because 'submission . . . [can]not [be] inferred from the circumstances.'" *Id.* (quoting *Corsello*, 428 F.3d at 1013) (alterations in original). Rather, the relator "must 'allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions.'" *Id.* (quoting *Corsello*, 428 F.3d at 1014).

To do so, a relator may, for example, attach billing data or a representative sample claim proving that allegedly false claims were actually submitted. *See id.* at 1276. But there is no single formula that complaints must follow. We consider "whether the allegations . . . contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006). The bottom line is that a relator must provide "some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311 (emphasis in original).[11]

---

[11] As we recently observed in *Gose v. Native American Services Corp.*, Rule 9(b) generally serves two purposes. *See* 109 F.4th at 1317. The first is to notify

Despite *84Partners*'s clear pronouncement that "[a] false claim is essential not only under § 3729(a)(1)(A), . . . but also under § 3729(a)(1)(B)," 79 F.4th at 1360, Olhausen contends that the requirement to plead that a claim was actually submitted does not apply to subsection (a)(1)(B) claims.[12] He offers two arguments to support his contention. We explain and address each one in turn.

First, Olhausen relies on the legislative history of Section 3729(a)(2). He notes that the Act's false-statements provision previously imposed liability on anyone who knowingly made "a false

---

defendants of exactly what misconduct they've been charged with, and the second is to protect them against frivolous lawsuits. *Id.* The second goal is "especially important" in cases alleging False Claims Act violations because of the "strong financial incentive" relators have in bringing suit. *Id.*

[12] Defendants argue that Olhausen forfeited the argument that Section 3729(a)(1)(B) does not require him to plead with particularity the submission of a false claim because he did not raise it before the district court. Generally, we will not consider issues raised for the first time on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (collecting cases). But we can entertain issues raised for the first time on appeal in limited circumstances, including if the "issue presents significant questions of general impact or of great public concern." *Id.* at 1332. Here, we are satisfied that whether Section 3279(a)(1)(B) requires relators to plead with particularity that a false claim was in fact submitted is a significant question of general impact. And to the extent that *84Partners* already ruled on the issue, we hope to clarify the reasoning and streamline the Section 3729(a)(1)(B) caselaw here. This issue affects the viability of an entire category of False Claims Act claims, so it has widespread effects on pleading requirements that go beyond the parties to this case. Thus, we choose to consider the merits. And in any case, because we conclude that Section 3279(a)(1)(B) does require relators to plead with particularity that a false claim was in fact submitted, Defendants are not prejudiced by our deciding this issue.

record or statement *to get a false or fraudulent claim paid or approved* by the Government."   31 U.S.C. § 3729(a)(2) (2008) (emphasis added).   But in 2009, Congress amended and renumbered the Act, which now imposes liability on anyone who knowingly makes "a false record or statement *material to a false or fraudulent claim*."   31 U.S.C. § 3729(a)(1)(B) (2009) (emphasis added).   Olhausen contends that Congress specifically removed the language "to get a false or fraudulent claim paid or approved by the Government" because these claims no longer require relators to plead that a false claim was actually submitted to the government.   *See* S. Rep. No. 111-10, at 12 (2009), *as reprinted in* 2009 U.S.C.C.A.N. 430, 439 ("[T]he language 'paid or approved by the Government' was removed . . . to prevent a new 'presentment' requirement from being read into the section.").

This argument is unavailing for two reasons.

First, it misunderstands the legislative history.   While Olhausen is right that Congress removed the specific requirement that a claim was "paid or approved by the government," the statute still requires that the false statement was "material to a false or fraudulent claim . . . ."   *See* 31 U.S.C. § 3729(a)(1)(B).   The Act then defines "claim" as "any request or demand . . . for money or property . . . *that . . . is presented . . . or . . . is made*" to the government or other specified entities.   *Id.* § 3729(b)(2) (emphasis added).   Altogether then, Section 3729(a)(1)(B) creates liability when a person knowingly makes a false statement that is material to a request or demand for money or property that is actually presented or made to

the government or specified entity.  *See id*. § 3729.  Put simply, the statute's text continues to require that relators plead the existence of a claim that was actually submitted.

The one line of legislative history that Olhausen flags—that Congress did not want a presentment requirement read into Section 3729(a)(1)(B)—does not say what he thinks it says and, in any event, cannot overcome the text of the statute.  The Senate Report states that the purpose of amending (a)(1)(B) was, in relevant part, "to prevent a *new* 'presentment' requirement from being read into the section."  *See* S. Rep. No. 111-10, at 12 (emphasis added).  The Report is not evidence that Congress intended to eliminate the presentment requirement altogether.  Rather, Congress made it so that plaintiffs no longer must prove that a defendant itself made false statements "to get a false or fraudulent claim paid or approved by the Government."

And the legislative history tells us why.  The Senate Report explains that Congress made these changes to Section 3729(a)(2) "[t]o correct the *Allison Engine* decision," for example, by removing "the words 'to get'" to "strik[e] the language [that] the Supreme Court found created an intent requirement for false claims liability under that section."  *Id*. (citing *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 669 (2008)).

*Allison Engine* held that "[u]nder § 3729(a)(2), a defendant must *intend* that the Government *itself* pay the claim."  553 U.S. at 669 (emphases added).  In so holding, the Supreme Court imputed an intent requirement to the statute that Congress did not intend

to add.  *See* S. Rep. No. 111-10, at 11–12.  More specifically, the Supreme Court reasoned that liability could attach for subcontractors under subsection (a)(2) if they submitted false statements to the general contractor, intending that the *government* (and not the general contractor) ultimately pay the claim.  553 U.S. at 669.  But the Senate Report said that in ruling that "there can be no liability unless the subcontractor intended to defraud the Federal Government, not just their general contractor," the Supreme Court acted "contrar[il]y to Congress's original intent . . . and create[d] a new element in a FCA claim and a new defense for any subcontractor that [were] inconsistent with the purpose and language of the statute."  S. Rep. No. 111-10, at 11.

So the Senate Report's statement that Congress amended subsection (a)(2) to subsection (a)(1)(B) to avoid reading a "new" presentment element into the statute refers to the new "intent for the government to pay" requirement that the Supreme Court wrongly injected into the 2008 version of the statute in *Allison Engine*.[13]  For this reason, the Senate Report does not support Olhausen's reading that the 2009 amendment eliminated a presentment

---

[13] The Senate Report adds that the amendment also sought to correct a D.C. Court of Appeals decision, *United States ex rel. Totten v. Bombardier Corp.*, which similarly held that the "plain language" of Section 3729(a)(1) provided that "claims must be presented to an officer or employee of the Government before liability can attach."  380 F.3d 488, 490 (D.C. Cir. 2004).  The Senate Report stated that *Totten*, like *Allison Engine*, mistakenly exempted subcontractors from the Act's reach in its interpretation of the statute's presentment clause.  S. Rep. No. 111-10, at 10–11.

requirement altogether.  Rather, the Report shows only that Congress intended—as it said itself in the Report—"[t]o correct the *Allison Engine* decision" as we've just described.  *See* S. Rep. No. 111-10, at 12.  Indeed, as the Supreme Court itself has emphasized, while Congress has amended the False Claims Act over time, "its focus remains on those who present or directly induce the *submission* of false or fraudulent claims."  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016) (emphasis added).

The second reason Olhausen's first argument fails is this: even if we credited Olhausen's clearly incorrect interpretation of the legislative history, it could not defeat the plain meaning of the text, in any case.  *See, e.g.*, *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("When the import of the words Congress has used is clear, . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.")  As we've explained, the text of subsection (a)(1)(B) expressly requires the "false record or statement" to be material to "a false or fraudulent *claim*."  31 U.S.C. § 3729(a)(1)(B) (emphasis added).  And the Act defines "claim," in relevant part, to mean "any request or demand . . . for money or property . . . *that . . . is presented . . . or . . . is made*" to the government or other specified entities.  *Id.* § 3729(b)(2) (emphasis added).  So by its terms, subsection (a)(2)(B) requires a false statement or record to have been made in connection with a claim that was "presented."

Moving on to Olhausen's second argument, Olhausen cites *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th

Cir. 2017), for the proposition that we already authoritatively held that relators bringing claims under Section (a)(1)(B) need not plead that a false claim was actually submitted to the government. He relies on this sentence from the opinion: "To prove a claim under § 3729(a)(1)(B), a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id.* at 1154. Olhausen points out that, unlike *Phalp*'s listing of the elements for a Section 3729(a)(1)(A) claim, *Phalp*'s articulation of the subsection (a)(1)(B) elements doesn't expressly include that the false claim must have been "presented . . . for payment or approval." *See id.* And even though we more recently said in *84Partners* that a "false claim is essential . . . under § 3729(a)(1)(B)," 79 F.4th at 1360, Olhausen argues that *Phalp* still controls under the prior-panel-precedent rule, because it preceded *84Partners* in time. He also contends that *84Partners*'s statement on the submission requirement was dicta.

We are not persuaded.

*Phalp* didn't hold that relators bringing claims under Section (a)(1)(B) don't need to plead that a false claim was actually submitted to the government. Rather, it accurately listed the elements of Section 3729(a)(1)(B) to include that the "statement was material to a false claim." 857 F.3d at 1154. And again, the term "claim" means a request that was presented or made. *See* 31 U.S.C. § 3729(b)(2). That *Phalp* didn't expressly break out the presentment requirement as a separate element doesn't change the fact that the

presentment requirement was necessarily part of the third element that *Phalp* listed.

Not only that, but *Phalp* said as much. *Phalp* explained that the Act does not impose liability for violations of the statutes and regulations governing Medicare "absent allegations that a specific fraudulent claim was in fact submitted to the government." 857 F.3d at 1154 (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009)).

Olhausen discounts *Phalp*'s statement to this effect because it quotes *Hopper*, and *Hopper* predated the amended version of Section 3729(a)(1)(B). But *Phalp* expressly recognized that Congress had amended Section 3729(a)(1). *See Phalp*, 857 F.3d at 1154 n.5. And it still relied on the rule *Hopper* laid out. *See id*. In fact, *Phalp* said that the relators' claims there failed "under either version of the statute." *Id*. So under our binding precedent, *Hopper*'s rule continues to apply after the amendment.

And as we've noted, that's also what *84Partners*'s interpretation of Section 3729(a)(1)(B) requires: a relator must plead presentment with particularity. As a result, Olhausen's argument that *Phalp* and the prior-panel-precedent rule invalidate *84Partners*'s ruling lacks merit.

We also disagree with Olhausen's assessment that *84Partners*'s statements on subsection (a)(1)(B) were dicta. Olhausen argues that the Court's statements in *84Partners* went "beyond the facts of the case" because the district court had dismissed the subsection (a)(1)(B) claim on the ground that the plaintiffs failed to

plead the "existence" of a claim, rather than the "submission" of one.

For starters, this slices the salami way too thinly. To be sure, the district court said that 84Partners had "failed to plead with particularity the existence of a claim, false or otherwise." *United States v. Huntington Ingalls Indus.*, No. 3:14-CV-1256-TJC-PDB, 2021 WL 4307510, at *5 (M.D. Fla. Sept. 22, 2021), *aff'd sub nom. United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353 (11th Cir. 2023). But the court found this to be a problem only because it meant that the relators there had failed to "plead that the false statement was connected to an actual false claim." *Id.* And as we've explained, under subsection (a)(1)(B), a "claim," by definition, must have been "presented or made." So it's simply incorrect to suggest that the district court did not determine that 84Partners failed to sufficiently allege that a claim had been presented. In fact, in our opinion, we characterized the district court order as having dismissed the complaint in *84Partners* "for failure to plead with particularity the actual submission or payment of false claims." 79 F.4th at 1356–57.

In any case, we "may affirm on any ground supported by the record," even if the district court did not rely on that ground. *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017). Here, there's no doubt that we affirmed the district court's dismissal of the subsection (a)(2)(B) claims because "the complaint [did] not allege with particularity the actual submission of false claims." *Id.* at 1361.

And even if we assumed these statements from *84Partners* were dicta—they aren't for the reasons we've explained—it still

wouldn't matter.  As we've mentioned, *Phalp* (not to mention the statutory text (and legislative history)) already compels the same conclusion as *84Partners*.  In short, we once again hold that a relator must plead with particularity the submission of a claim when asserting a cause of action under subsection (a)(2)(B).

We are not alone in that understanding.  Indeed, as far as we can tell, every other Circuit to have considered the question has reached the same conclusion:  that the relator must show presentment to prevail under Section 3729(a)(1)(B).[14]  So for both his Section 3729(a)(1)(A) and Section 3729(a)(1)(B) claims, Olhausen must plead with particularity that a false or fraudulent claim was actually submitted.

> ## B.  Olhausen pled with particularity that an allegedly false claim had been actually submitted, for both his

---

[14] *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (observing that, even though "[Section] 3729(a)(1)(B) does not require that the defendant itself 'present' the false claim to the government," "a plaintiff asserting an FCA claim is still required to show that a false claim was submitted to the government"); *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) ("Section 3719(a)(1)(B) requires a relator to 'plead a connection between the alleged fraud and an actual claim made to the government.'" (citation omitted)); *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 741 (8th Cir. 2020) ("There is no 'presentment' requirement for a § 3729(a)(1)(B) claim.  However, the plaintiff must 'plead a connection between the alleged fraud and an actual claim made payable to the government.'" (citation omitted)); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335 (9th Cir. 2017) ("The existence of a false or fraudulent claim is . . . an essential element of a false records claim under § 3729(a)(1)(B).").

*Section 3729(a)(1)(A) and (a)(1)(B) claims, on the the-*
*ory he pursued in Count II.*

We conclude that Olhausen's complaint pled with particu-
larity that Arriva and Alere submitted allegedly false claims under
Count II's theory. That's so because, as we show below, the alle-
gations assert the "'who,' 'what,' 'where,' 'when,' and 'how' of
fraudulent submissions.'" *Carrel*, 898 F.3d at 1275 (quoting *Corsello*,
428 F.3d at 1014). And they "contain sufficient indicia of reliability
to satisfy Rule 9(b)," *Atkins*, 470 F.3d at 1358.

We begin with the who, what, where, when, and how. The
complaint alleges that Arriva and Alere ("who") submitted claims
for products like heating pads ("what") to CMS from locations in
Florida, Arizona, Tennessee, and the Philippines ("where") at least
during the third quarter of 2015 ("when"), by knowingly and falsely
representing that they had assignments of benefits on file ("how").

More specifically, the complaint asserts that Arriva con-
ducted internal audits on claims it submitted to CMS. Those audits
showed that, contrary to Arriva's representations to the govern-
ment, Arriva had not obtained assignments of benefits for many
claims it submitted. According to the complaint, the audits
showed, among other things, that "[f]or the third quarter of
2015, . . . on average, Arriva had an [assignment of benefits] on file
for the beneficiary for only fifty-three percent (53%) of heating pads
Arriva shipped to its beneficiaries and billed to Medicare." Yet heat-
ing pads were not covered by the DMEPOS competitive bidding

program, Olhausen contends, so Arriva had to have assignments on file to receive Medicare payments for these products.[15]

The upshot of these allegations is that the findings of the internal audit—that assignments were on file for only 53% of claims "billed to Medicare" for heating pads—amount to an allegation that 47% of the submitted claims for heating pads during the third quarter of 2015 impermissibly lacked an assignment of benefits, even though Arriva and Alere falsely advised the government that those claims had assignments of benefit. So through the audit allegations, Olhausen pled with particularity that Arriva and Alere submitted "at least some of the claims," *see Clausen*, 290 F.3d at 1312 n.21, that were allegedly false under the theory in Count II, to CMS.

In other words, we don't have to assume that claims were submitted. Rather, the complaint alleges that proof exists that at least some the claims at issue in Count II were actually submitted—those for heating pads in the third quarter of 2015. As a result, Count II does not seek to use the False Claims Act to punish violations of healthcare regulations generally. Instead, it pursues Defendants' liability for the actual submission of allegedly false claims, for which assignments of benefits were not on file.

Indeed, the District of Columbia Circuit Court has also recognized that allegations about an audit can provide the necessary

---

[15] The parties dispute whether assignments of benefits were legally required in the first place. We take no position on that question here.

particularity when it comes to submitting a false claim. In *United States ex rel. Heath v. AT&T, Inc.*, an auditor who reviewed claims that the defendant submitted to a public-school system alleged that the defendant overbilled the government by millions of dollars. 791 F.3d 112, 117, 124 (D.C. Cir. 2015). The court held that the relator's complaint satisfied Rule 9(b) because it provided sufficient details about the alleged fraud to put the defendant "on fair notice of the fraud of which it [was] accused." *Id.* We think the allegations about the internal audit here are similarly adequate. And Defendants are on fair notice because these audits were allegedly internal to Arriva, so Arriva has copies of them and can defend against these claims.

Plus, the allegations in the complaint contain other indicia of reliability besides their reliance on specific audit results. Olhausen alleges enough to show that his position as an insider gave him "direct, first-hand knowledge" that Defendants submitted false claims. As the complaint asserts, Olhausen's "high level position" allowed him to participate in Arriva weekly meetings and supervise Arriva employees—which allowed him to personally learn of Defendants' fraudulent practices. We have found similar allegations, in connection with the who, what, where, when, and how, to satisfy Rule 9(b)'s particularity requirement. *See*, *e.g.*, *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012) (holding that the relator sufficiently alleged that the defendants submitted the relevant statement because the relator was personally involved in creating the statement, provided details about the statement, and pointed to circumstantial evidence that it had

been submitted); *United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that the relator sufficiently pled submission of false claims because she alleged that she was personally involved in improper billing and was told by another employee that this type of billing was common practice).

In sum, the who, what, where, when, and how that the complaint alleges—combined with the indicia of reliability that the audit and Olhausen's basis for knowledge provide—are enough to survive Rule 9(b)'s particularity standard.

The cases Defendants point to do not suggest otherwise. Defendants direct us to *Carrel*, *Atkins*, and *Clausen*—all cases where we found that the allegations were insufficient under Rule 9(b). In *Carrel*, the relators alleged that they personally saw the payment of kickbacks and attached a spreadsheet listing patient information and potential public funding sources for each patient. 898 F.3d at 1278. As for *Atkins*, there, the relator provided "particular patients, dates, and corresponding medical records for services" that he argued were not eligible for reimbursement. 470 F.3d at 1359. And in *Clausen*, the complaint detailed the specific patients, dates of testing, and testing procedures that were part of the alleged scheme. 290 F.3d at 1315.

But in each case, the relators failed to allege any details about any claims that were *actually submitted* in connection with the alleged schemes. Instead, after detailing allegations about violations of CMS regulations, they "summarily conclude[d] that the

defendants submitted false claims . . . ." *Atkins*, 470 F.3d at 1359; *accord Clausen*, 290 F.3d at 1312–13 (finding that Clausen's "conclusory" allegations were not enough); *Carrel*, 898 F.3d at 1278 (finding that the plaintiff's "general allegations" were not enough, and were lacking in "more exact allegations that these factors converged into actual false claims"). In contrast, here, Olhausen alleges information from the audits showing that allegedly false claims were actually submitted to CMS for at least some claims at issue in Count II. So none of the cases Defendants rely on support the conclusion here that Olhausen did not plead Count II with sufficient particularity as to all claims Arriva and Alere submitted to CMS.

In sum, Olhausen has provided the who, what, where, when, and how of the allegedly fraudulent submissions. And those allegations enjoy sufficient indicia of reliability. So we conclude that Olhausen has adequately pled with sufficient particularity that allegedly false claims were actually submitted as to Count II.

Of course, Olhausen still must be able to prove that his interpretation of the Medicare regulations is correct and that he can satisfy all the elements of a False Claims Act claim for Count II. Defendants moved to dismiss on the grounds that Olhausen failed to adequately plead falsity, scienter, and materiality. And Defendants dispute whether the regulations require signatures and assignments of benefits for the claims in Count II in the first place.

We don't address any of those issues, and we offer no view on them. Rather, we remand them to the district court to consider in the first instance.

C. *Olhausen failed to plead with particularity that an al-*
*legedly false claim had been actually submitted, for*
*both his Section 3729(a)(1)(A) and (a)(1)(B) claims,*
*on the theory Count IV pursues.*

The complaint charges Count IV, like Count II, under both Sections 3729(a)(1)(A) and 3729(a)(1)(B). In Count IV, Olhausen asserts that Arriva's competitive bidding contract under the DMEPOS program required it to identify service-providing locations or subcontractors (or both), and its alleged failure to do so is actionable under the False Claims Act. To prove this theory, Olhausen must show, as relevant here, that actual claims were submitted involving (1) items that the DMEPOS program covered and (2) the allegedly undisclosed or unaccredited locations (or both). But Olhausen's complaint fails to adequately allege that Arriva or Alere submitted any claims under the DMEPOS competitive bidding program, or involving any unaccredited or undisclosed locations.

This is so for three reasons.

First, the audit allegations don't help Olhausen with Count IV. Under Count IV's theory, Arriva must have made claims involving products covered under the DMEPOS contract. But the complaint itself alleges that the products that the audit allegations discuss (heating pads, vacuum erection devices, and orthotic braces) were not "covered by the DMEPOS competitive bidding

21-10366          Opinion of the Court          33

program . . . ."[16] Because the products mentioned in the audit allegations were expressly alleged to not be covered by the DMEPOS program,[17] Olhausen has failed to plead with particularity his theory under Count IV.

Second, even if the unspecified items in the audit allegations were allegedly covered by the DMEPOS competitive bidding program, the allegations also do not make clear whether any of the audits concerned claims involving the Philippines, Arizona, or Tennessee locations. First off, the complaint identifies no particular false claim submitted to CMS that involved any of the three locations (the Philippines, Arizona, and Tennessee)[18] that were

---

[16] This fact is core to the allegations of Count II. There, as we've discussed, Olhausen contended that assignments of benefits were required *because* the audited items were not covered by the DMEPOS program. So while the audit allegations bolster Count II, they cannot be used to salvage Count IV.

[17] The main audit allegations name only one product: heating pads. The other audit allegations do not specify any product and discuss only claims "for new orders" that Defendants allegedly submitted in particular quarters. In his brief, Olhausen argues that in context, the products these allegations reference are heating pads, vacuum erection devices, or orthotic braces. But even assuming that's true, these allegations cannot possibly support Count IV. And even if other products, which *were* covered by the DMEPOS program, were involved in the audit allegations, the audits still cannot fix Olhausen's problem. As we explain below, the audit allegations don't provide sufficient indicia of reliability as to Count IV's theory: that Arriva used the three undisclosed and unaccredited locations to actually submit to CMS any particular or all the claims the audit allegations mention.

[18] Defendants agree that the Florida location "undisputably" was properly accredited. So any Florida-based claims can't sustain Count IV's theory.

allegedly undisclosed or unaccredited, or both. Nor does the complaint allege that every claim Arriva submitted to CMS involved these three locations, so we can't identify the specific claims that involved these locations that way. Olhausen's position, meetings, and interactions with Arriva employees, on their own, also don't show that any claim was actually submitted involving the Philippines, Arizona, or Tennessee.

Given that Count IV's theory centers on the undisclosed and unaccredited nature of these locations, it is critical that the complaint specifically tie a submitted claim to at least one of these locations. Yet it does not do so. Rather, it paints with a broad brush, alleging only generally that false claims that involved these three locations were submitted. That's not enough to provide fair notice to Defendants.

Third, we can't just "infer[] from the circumstances" Olhausen alleges that Arriva or Alere submitted a claim for DMEPOS equipment that involved the Philippines, Tennessee, or Arizona. *See Carrel*, 898 F.3d at 1275 (quoting *Corsello*, 428 F.3d at 1013). Olhausen asks us to do that, but Rule 9(b) and our precedent forbid it. The complaint alleges that "most claims [that] were submitted by Arriva were routed through Arriva Philippines," and that "Arriva knew the audits applied to Arriva Philippines." He also points to allegations that describe the billing software, which, he alleges, was configured to misleadingly show that claims processed in the Philippines were instead processed in Florida. Putting these together, Olhausen contends that these allegations make "plausible"

the "inference" that the audit allegations concern at least some claims involving the Philippines.

But this is just the sort of inference that Rule 9(b), in the False Claims Act context, forbids. In *Carrel*, for instance, the relator alleged that not quite fifty percent of the defendant's funding there came from the government. 898 F.3d at 1277. Based on that allegation, the relator argued that, by "mathematical probability . . . the [defendant] surely must have submitted a false claim at some point." *Id.* We rejected that inference as speculation that was insufficient to show that the defendant actually submitted a claim, and we said that the allegations failed to meet Rule 9(b)'s particularity requirement. *See id.* And as to the *Carrell* relator's efforts to rely on "a mosaic of circumstances that are perhaps consistent with their accusations that the Foundation made false claims," we explained that "the relators fail[ed] to allege with particularity that these background factors ever converged and produced an actual false claim . . . ." *Id.*

At bottom, relators must plead their claims with particularity. It's not enough under Rule 9(b) to speculate that a claim must have been submitted. Yet the complaint does just that when it relies on the audit allegations to satisfy the particularity requirement for Count IV. So while the audit allegations can save Count II, they cannot save Count IV.

Ultimately, Olhausen fails to plead with particularity that any claims involving the locations or DMEPOS contracts at issue in Count IV were actually submitted. And that is fatal under both

Sections 3729(a)(1)(A) and 3729(a)(1)(B). So we uphold the district court's decision to dismiss Count IV in its entirety.

### D. *We reverse Count VI.*

The district court dismissed Count VI, conspiracy to commit the alleged False Claims Act violations, for the sole reason that it found Olhausen had failed to adequately allege underlying violations of the Act. Because we reverse the district court's dismissal of Count II, we also reverse the district court's dismissal of Count VI.

## IV.    CONCLUSION

For these reasons, we vacate the dismissal of Counts II and VI. But we affirm the dismissal of Count IV. We remand the case to the district court for further proceedings consistent with this opinion.

**AFFRIMED IN PART; VACATED and REMANDED IN PART.**